UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 12-20256-CR-SCOLA

UNITED STATES OF AMERICA

vs.

DARIUS MOORE,

    Defendant.
_____/

**ORDER AFFIRMING AND ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS**

THIS MATTER is before the Court upon Magistrate Judge Barry L. Garber's Report and Recommendation [ECF No. 36] on Defendant Darius Moore's Motion to Suppress In-Court and Out-Of-Court Identification and Request for Evidentiary Hearing [ECF No. 26]. The Court has conducted a *de novo* review of the record and has considered the Defendant's Objections to the Report and Recommendation [ECF No. 42], and the Government's Response to the Defendant's Objections [ECF No. 43]. For the reasons explained below, the Report and Recommendation is affirmed and adopted.

**Introduction**

On August 14, 2011, a family of three (husband, wife, and son) pulled into the parking lot of their apartment complex after a day at the beach. *See* 10/09/2012 Mag. Hearing Trans. (hereinafter, "Trans.") at 7. The wife got out of the car to begin unpacking their things when a masked gunman appeared and demanded the keys to the car. *Id.* at 7. The gunman approached on foot and was in close proximity to the victims during the incident. *Id.* at 44. After the wife handed him the keys, the gunman ordered everyone out of the car, got inside, and then drove away. *Id.* at 7, 47-48.

Immediately after the car-jacking, the victims separately described the gunman as a slender black male, about 5'7" to 6' tall and 150 to 160 pounds, who was wearing a ski mask and dark clothing. *Id.* at 8-10, 49. They initially provided statements to Officer Wilfredo Sanchez, but he had to leave the scene. *Id.* at 46. Thereafter, Officer Manuel Orta questioned the victims about the incident and prepared a report. *Id.* at 46-50.

As the victims were providing information to police, a be-on-the-lookout ("BOLO") was issued for the vehicle in question and a car chase with police ensued. *Id.* at 10-11. The chase eventually ended in a crash and two individuals were apprehended from the car – the Defendant and his half-brother, Davares Rowe, who was described as heavier and of different skin tone than the Defendant. *Id.* at 12, 18, 23-24. The victims were not aware that the car chase had ended in a crash, nor did they know two individuals were taken from the car. *Id.* at 11-12, 50. After receiving the victims' statements, Officer Orta left the scene to prepare a police report; he played no role in the show-up that followed. *Id.* at 50.

Detective Anthony Feria, who handles robbery investigations for the Miami-Dade Police Department, also came to the apartment complex where the car-jacking occurred and took separate statements from the victims. *Id.* at 6-7. The victims provided largely the same descriptions of the gunman as noted above. *Id.* at 8-10. There was some disagreement, however, between the testimony of Officer Orta and Detective Feira as to whether the gunman's mask was fully or partially covering his face and whether or not the victims could, or could not, see and identify his hair and eye color. *Compare* Trans. at 8-10 *with* Trans. at 49. Also, while the victims told Detective Feria that they saw enough of the gunman's identifying characteristics to later make an identification, Officer Orta testified that they told him the gunman was wearing "a ski mask and they wouldn't be able to tell." *Compare* Trans. at 8-10 *with* Trans. at 51.

Detective Feria drove each of the victims separately to the show-up, which took place about an hour-and-a-half after the car-jacking. *Id.* at 13-14, 21. The victims were kept apart from one another and not allowed to discuss what they said, or who they identified, at the show-up. *Id.* at 19. The show-up was conducted near the site of the car crash, but the victims were not able to see the crashed vehicle, nor did they have reason to know the car was nearby. *Id.* at 14-16, 35-36.

Detective Feria explained the procedure for the show-up to the victims and told them he would "have them look at somebody or some people that may or may not have been involved in the incident." *Id.* 13. He also said they should "look at that person or persons and let [him] know if they recognize them, and if so, how." *Id.* Each victim was separately shown the Defendant and Rowe, one after the other. *Id.* at 17-20. The suspects were handcuffed and put in front the police car where each victim was situated, with the high beams shining at each suspect so that he could not see into the car. *Id.* at 9, 16. Each victim proceeded to separately identify the Defendant as the perpetrator. *Id.* at 17-21. Even though the gunman's face had been fully or partially obscured

by a mask during the incident, each victim stated they were in fact certain Defendant was the carjacker based on his build, facial features, appearance, and clothing. *Id.*

The issue before the Court is whether the identification of the Defendant at the show-up should be suppressed as unduly suggestive and unreliable. The Magistrate Judge found the show-up was not overly suggestive and that even assuming it was, the victims' identifications were nonetheless reliable. R&R at 6-7. Defendant objects that the Magistrate Judge failed to include in his findings certain testimony of Officer Orta, the police officer tendered by the defense at the hearing. Obj. at 4-8. According to Defendant, the Magistrate Judge "failed to resolve, or even address, directly conflicting testimony between the government's witness (Detective Anthony Feria) and the defense's witness (Officer Manuel Orta)," thereby leaving several factual inconsistencies unresolved. *Id.* at 4-5. Defendant also re-argues that the show-up procedure was unduly suggestive and that the victim identifications were unreliable. *Id.* at 8-12.

## Legal Standards

### A. Magistrate Judge's Report and Recommendation

A party may challenge the findings in a magistrate judge's report by timely filing specific written objections. *See* Fed. R. Crim. P. 59(b)(2); *Macort v. Prem, Inc.*, 208 F. App'x. 781, 783 (11th Cir. 2006). When objections are filed, the district court reviews *de novo* the disputed portions of the magistrate judge's report and recommendations. *See United States v. Powell*, 628 F.3d, 1254, 1256 (11th Cir. 2010). "As the use of the phrase *de novo* implies, the district court's consideration of the factual issue must be independent and based upon the record before the court." *LoConte v. Dugger*, 847 F.2d 745, 750 (11th Cir. 1988); *Macort*, 208 F. App'x at 783. Where the magistrate judge considered witness testimony, "the district court is obligated to review the transcript or listen to the tape-recording of those proceedings." *See LoConte*, 847 F.2d at 750. In considering any properly raised objections, "[t]he district judge may accept, reject, or modify the recommendation" of the magistrate judge. *See* Fed. R. Crim. P. 59(b)(3).

### B. Motion to Suppress Show-Up Identification

Although show-ups – that is, "showing suspects singly to persons for the purposes of identification" – are considered inherently suggestive, admitting them into evidence does not automatically violate due process. *United States v. Winfrey*, 403 F. App'x 432, 435 (11th Cir. 2010) (citations omitted). Show-ups can serve a laudable and valuable law enforcement purpose –

they facilitate the identification of a crime's perpetrator to the exclusion of others while the witness's memory is fresh, such that the others, if innocent, may be set free instead of being unjustly detained for crimes they did not commit. *See Johnson v. Dugger*, 817 F.2d 726, 729 (11th Cir. 1987); *see also Brisco v. Ercole*, 565 F.3d 80, 88-89 (2d Cir. 2009).

With this purpose in mind, the key question is whether the show-up procedure was ***unduly*** suggestive and unnecessary. *See Perry v. New Hampshire*, 132 S. Ct. 716, 724 (2012); *United States v. Diaz*, 248 F.3d 1065, 1102 (11th Cir. 2001). Show-ups rise to this level "only when 'police aggravate the suggestiveness of the confrontation.'" *See Winfrey*, 403 F. App'x at 435; *Perry*, 132 S. Ct. at 724.

Even when the police use an overly suggestive procedure, however, "suppression of the resulting identification is not the inevitable consequence." *See id.* Such a bright-line rule, the Supreme Court has said, would "go too far" by keeping potentially reliable and relevant evidence from the jury, which inadvertently "may result, on occasion, in the guilty going free." *See id.* (quotation marks and alterations omitted).

Instead of imposing a *per se* exclusionary rule for overly suggestive show-ups, the Supreme Court has required "courts to assess, on a case-by-case basis, whether improper police conduct created a 'substantial likelihood of misidentification,'" which in turn brings the focus to the reliability of the identification. *See id.* at 724-25. In deciding whether, under the totality of the circumstances, "the identification was nonetheless reliable," the court must consider the following factors: (1) the witness's opportunity to view the suspect at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the show-up; and (5) the length of time between the crime and the show-up identification. *See Diaz*, 248 F.3d at 1102. Only when the indicators of reliability are outweighed by "the corrupting effect of law enforcement suggestion" should the show-up identification be suppressed. *See Perry*, 132 S. Ct. at at 725 (quotation marks omitted).

## Legal Analysis

The Court agrees with the Magistrate Judge that the show-up in this case was not unduly suggestive. Further, even assuming the show-up procedure was too suggestive, the Court agrees that the victims' identifications were nonetheless reliable. Therefore, as the Magistrate Judge found, the Defendant's Motion to Suppress must be denied.

### A. Was the Show-Up Unduly Suggestive?

Defendant argues that the police aggravated the suggestiveness of the show-up because he was put before the victims in handcuffs after being removed from a police car, thus making clear that he was already in police custody. He also contends that Detective Feria compounded the problem by allowing each victim to view Defendant and Rowe in sequential fashion, even after they had positively identified Defendant as the perpetrator. In this regard, Defendant points out that the car-jacking was, by all accounts, committed by one person, not two. Further, he says, Defendant and Rowe looked nothing alike. "Having the witnesses view an individual with drastically different physical characteristics," Defendant argues, "resulted in the shoring up [of] the victims' belief that they had correctly identified [him] as the man that had carjacked them." Obj. 10-11. Finally, the Defendant maintains that after the show-up, the victims should not have been allowed to see their wrecked car, which was out of view but nearby, because informing the victims "that the wreckage of their car was just a short-distance from the man they had just identified as the suspect would have resulted in further shoring up of their belief that they identified the right guy – further tainting their identification that night and any subsequent in-court identifications." *Id.* at 11.

The Court rejects these arguments. The fact that the Defendant was in custody and presented in handcuffs does not mean the police unnecessarily or unduly aggravated the suggestiveness of the show-up procedure. In fact, the Eleventh Circuit rejected such an argument in *United States v. Walker*, 201 F. App'x 737, 741 (11th Cir. 2006), where the suspect "was presented for identification singly, in handcuffs, and surrounded by police officers." Other courts have reached the same conclusion. In *United States v. Bautista*, 23 F.3d 726, 730 (2d Cir. 1994), for example, the court of appeals held that a show-up was not rendered unnecessarily suggestive by "[t]he fact that the suspects were handcuffed, in the custody of law enforcement officers, and illuminated by flashlights[.]" As the court said, "handcuffs, custody, and flashlights were all necessary incidents of an on-the-scene identification immediately following a night-time narcotics raid." *Id.* Similarly here, the use of custody and handcuffs were necessary incidents to ensure "the safety of the officers" and to prevent the suspects from "taking off again." Trans. at 16-17. Indeed, it was nighttime and the suspects had just been apprehended following a high-speed chase in which they attempted to elude police. Thus, rather than being overly suggestive, the procedures employed were quite reasonable under the circumstances.

Further, the show-up was not made unduly suggestive by the fact that both suspects were presented to the victims in sequential fashion. Show-ups that involve the presentation of only a single suspect are not *per se* overly suggestive. *See Roper v. Beto*, 454 F.2d 499, 502 (5th Cir. 1972) ("One man showups have not been adjudged per se violative of due process."); *see also Walker*, 201 F. App'x at 741 ("[Defendant] cites no authority for his position that identification of a single individual is intrinsically suggestive, and our precedent suggests that it is not," citing *Blanco v. Singletary*, 943 F.2d 1477, 1508-09 (11th Cir. 1991)). If anything, in presenting both suspects and instructing the victims that they "may or may not have been involved in the incident," *see* Trans. at 17, Detective Feria avoided singling out one suspect and mitigated the suggestiveness of the procedure. Moreover, Detective Feria explained that he chose to show the victims both suspects, even though the crime was allegedly carried out by a single perpetrator, because he "wasn't at the robbery" and there were two people inside the car. In this way, the two-person show-up procedure would likely allow the police to set at least one person free after viewing by the victims.[1] In short, the sequential presentation of the suspects made sense; it did not aggravate the suggestiveness of the show-up.

Nor does it matter greatly that the Defendant and Rowe did not look alike. Contrary to Defendant's argument, this situation is not analogous to cases involving overly suggestive photo line-up procedures. In a show-up, one or two suspects are put before the victim immediately following a crime so that the perpetrator may be identified before he has altered his appearance, while the witness's memory is fresh. *See Johnson*, 817 F.2d at 729. In a photo line-up, by contrast, the police typically present a photo array of individuals generally fitting the suspect's description. An obvious outlier among the photos could prove unduly suggestive in such a setting. *See United States v. Garcon*, 2008 WL 420041, at *8 (S.D. Fla. Feb. 13, 2008) (Hurley, J.) ("A photographic lineup is unduly suggestive, when the defendant's photo significantly stands out from the rest of the photos in the array."); *see also Q'Brien v. Wainwright*, 738 F.2d 1139, 1141

---

[1] Defendant argues that neither suspect was going free following the show-up, no matter who the victims identified, because both he and Rowe were apprehended following a police chase. Obj. at 8-9. This argument misses the point. The question is not whether the suspects would be set free *vel non*, but whether they might be exonerated as to the car-jacking crime. As Detective Feria testified, when Rowe was not identified as the car-jacker, he informed "the officers there that [Rowe] was not going to be arrested for robbery." Trans. at 42-43. Thus, the show-up in this case "permit[ted] the quick release of [an] innocent person[ ]" as to the crime in question. *See Johnson*, 817 F.2d at 729.

(11th Cir. 1988) (photo line-up unduly suggestive where defendant's photo "stuck out like a 'sore thumb'"). But show-ups are different. *See United States v. Hefferon*, 314 F.3d 211, 217 (5th Cir. 2002). They are done on the spot, under exigent circumstances, in close proximity to a crime, and usually involve the presentation of suspects that have been in some fashion apprehended. That the persons apprehended fail to look alike does not mean the procedure is overly suggestive. It therefore follows that, here, the police did not aggravate the suggestiveness of the show-up merely by presenting both individuals that were found in the victims' crashed stolen car.[2] *Cf. United States v. King*, 148 F.3d 968, 970 (8th Cir. 1998) ("Police officers need not limit themselves to station house line-ups when an opportunity for a quick, on-the-scene identification arises. Such identifications are essential to free innocent suspects and to inform the police if further investigation is necessary.").

The show-up was also not rendered unduly suggestive by the fact that the victims were allowed to see their wrecked car *after* they identified Defendant as the perpetrator. Defendant argues that seeing the wreckage a short distance from where the show-up took place "resulted in further shoring up of [the victims'] belief that they identified the right guy." Obj. at 11. As Detective Feria explained, however, there was no uncertainty in the victims' identification in the first place. They all stated with certainty that Defendant was the car-jacker. Trans. at 17-21. Thus, there was nothing to "shore up" – this is not a case where the victims weren't sure or could not make an identification. In such circumstances, the Court fails to see how the subsequent event (that is, the viewing of the wrecked car) made the earlier-in-time show-up more suggestive. Nor, for the same reason, would it taint any future in-court identifications that might take place.

---

[2] Moreover, even where line-ups (as opposed to show-ups) are involved, "[t]he disparate physical appearances of the lineup participants is not alone sufficient to warrant a finding of suggestiveness." *United States v. Ullrich*, 580 F.2d 765, 773 (5th Cir. 1978). As explained in *United States v. Traeger*, 289 F.3d 461 (7th Cir. 2002):

> Authorities conducting lineups are required only to make reasonable efforts under the circumstances to conduct a fair and balanced presentation. They are not required to search for identical twins in age, height, weight, or facial features. . . . The fact that the other lineup participants could not pass for [defendant's] twins did not make the lineup unduly suggestive.

*Id.* at 474 (citation omitted). Thus, even though Rowe apparently could not pass for Defendant's twin, the show-up in this case was not made overly suggestive by that fact alone. *See Ullrich*, 580 F.2d at 773.

### B. Were the Identifications Reliable?

Only where the police have aggravated the suggestiveness of the show-up procedure must the Court consider whether the witness identifications are nonetheless reliable. *See United States v. Gay*, 423 F. App'x 873, 877 (11th Cir. 2011). Here, because the show-up procedure was not unduly suggestive, the Court need go no further. *See id.* Even if aggravated suggestiveness is assumed, however, it is clear that the identifications were sufficiently reliable in view of the relevant factors.

While the car-jacking lasted only a few minutes, the witnesses all had adequate opportunity to view the perpetrator, as he was "[o]n foot and in their face" during the crime. Trans. at 43. Also, while the crime took place at night, the lighting at the apartment complex was described as "good." *Id.* at 39-40. Given the nature of the crime, there is no reason to doubt the victims' attentiveness. Nothing in the record suggests otherwise. Indeed, each victim was able to provide fairly consistent descriptions of the car-jacker to both Officer Orta and to Detective Feria after the incident, notwithstanding the short duration of the crime. *Id.* at 8-10, 49. In addition, very little time elapsed between the time of the crime and the show-up identification (about an hour-and-a-half), and each victim separately indicated their certainty that the Defendant was the perpetrator immediately upon seeing him, without conferring with one another. *Id.* at 17-21. Under these circumstances, the victims' identifications were clearly reliable.[3]

**DONE and ORDERED** in chambers, at Miami, Florida on January 17, 2013.

_____
ROBERT N. SCOLA, JR.
UNITED STATES DISTRICT JUDGE

*Copies to:*
*Magistrate Judge Garber*
*Counsel of Record*

---

[3] The Defendant protests much that the Magistrate Judge failed to resolve important factual disputes between the testimony of Detective Feria, offered by the Government, and Officer Orta, offered by the defense. Obj. at 4-8. This Court disagrees. As a fair reading of the hearing transcript makes plain, the two officers' testimony was, in most respects, wholly consistent. To the extent that it was not, however, the Magistrate clearly found Detective Feria a more credible and persuasive witness than Officer Orta. *See* R&R at 7 (finding Detective Feria's testimony "highly credible, persuasive, and not rebutted by the defense"). This Court will not disturb that determination. *See United States v. Emanuel*, 440 F. App'x 881, 883 (11th Cir. 2011) ("we defer to a magistrate judge's credibility determinations 'unless [his] understanding of the facts appears to be unbelievable.'"); *see also United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002).